**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MELCINA BLANTON, | CIVIL ACTION No. |
| | 15 CV 3156 |
| Plaintiff, | |
| | |
| v. | |
| | |
| ROUNDPOINT MORTGAGE SERVICING CORP., and LOCKE LORD LLP | |
| | |
| Defendants. | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.  Plaintiff Melcina Blanton ("Plaintiff") is the owner of residential real property, located at, and commonly known as 7727 South Bennett, Chicago, IL 60649 (the "Property"). See Blanton Decl., Exhibit A, Paragraph 1.

2.  Defendant Roundpoint Mortgage Servicing Corporation (hereinafter "Defendant Roundpoint" or "Roundpoint") is a Florida corporation, a mortgage loan servicer with its principal place of business in North Carolina. It is not in good standing in Illinois. Roundpoint is the current servicer (i.e., it collects interest, principal, and escrow payments) of a Note and Mortgage on the Property that secures said Note (the "Loan' or Plaintiff's Loan"). Servicing of the Loan was transferred to Roundpoint on or about November 5, 2013. See Blanton Decl., Exhibit A, Paragraph 2.

3. Defendant Locke Lord, LLP (hereinafter "Defendant Locke Lord" or "Locke Lord" is an international law firm, headquartered in Dallas Texas, with an office located in Chicago, Illinois. According to its web site at the following URL (last accessed on September 7, 2015), http://www.lockelord.com/services/practices/consumer-finance, Locke Lord's Consumer Finance Practice Group is "devoted to defending consumer lenders against class actions andindividual actions brought pursuant to a variety of state and federal consumer protection statutes, including cases involving mortgage fraud, predatory lending and unfair and deceptive acts and practices statutes." Locke Lord also represents said consumer lenders in mortgage foreclosures and is thus engaged in the business of using the mails to collect residential mortgage debts. See Blanton Decl., Exhibit A, Paragraph 5.

4. Locke Lord was engaged to represent Roundpoint on or about July of 2014, during and following the dismissal of the above referenced First Foreclosure action against the Plaintiff, and has continued to try to collect sums allegedly due from Plaintiff to Roundpoint on her allegedly delinquent Loan. See Blanton Decl., Exhibit A, Paragraph 6.

5. The case concerns numerous, material errors and false statements that the Defendants Roundpoint, and Locke Lord made in servicing, accounting for, and attempting to collect on Plaintiff's Loan immediately following the November 2013 transfer of the servicing of the Loan to Roundpoint; and the Defendants' failure to properly acknowledge and respond to Plaintiff's numerous Requests for Information, Notice of Errors and Qualified Written Requests concerning alleged

delinquencies. It also concerns the continuing and improper accounting for and servicing of Plaintiff's Loan, which conduct is unscrupulous, immoral, unfair and deceptive and has damaged the Plaintiff thereby. See Blanton Decl., Exhibit A, Paragraph 17.

6. Plaintiff was at all times relevant herein engaged in actively disputing the alleged, but incorrect, delinquency on her Loan with Roundpoint, and with Codilis prior to and during the pendency of a wrongful foreclosure proceeding filed against her (First Foreclosure) and then engaged with Locke Lord following the dismissal of the First Foreclosure, and finally Johnson Blumberg on the still-pending Second Foreclosure. See Blanton Decl., Exhibit A, Paragraph 18.

7. Defendants' actions towards Plaintiff constitute material violations of numerous sections of the new federal RESPA and TILA servicing regulations and the FDCPA, as will appear more fully set out below. In addition, Defendants' unconscionable and immoral conduct violated the Illinois Consumer Fraud and Deceptive Practices Act. See Blanton Decl., Exhibit A, Paragraph 19.

8. Further, Defendant Roundpoint appears to have converted $3094.54 that was in November and December of 2014 being held in suspense in violation of Regulation X to RESPA and then without explanation or redistribution removed from Plaintiff's account in January of 2015. See Blanton Decl., Exhibit A, Paragraph 20.

9. In essence, Roundpoint made incorrect calculations and attempted to assess improper charges upon beginning to service the Plaintiff's Loan and, as a result, has improperly and destructively treated the Plaintiff as chronically delinquent on her Loan obligations, all to Plaintiff's great and continuing damage and prejudice and

compromised mental and physical health. <u>See</u> Blanton Decl., Exhibit A, Paragraph 21.

## FACTS

10. On or about June 25, 2009 Plaintiff Blanton borrowed $104,500 from Community Bank of Oak Park and River Forest. Said Loan is evidenced by a Note and was secured by a Mortgage on

    her personal residence located at 7727 South Bennett, Chicago, IL 60649. <u>See</u> Blanton Decl., Exhibit A, PLAINTIFF'S EXHIBITS 1 and 2, respectively).

11. From her first payment on the Loan to her original servicer, Franklin American Mortgage Company (hereinafter "Franklin"), until the servicing rights were transferred to Defendant Roundpoint, Plaintiff was never late or in arrears on her mortgage Loan. <u>See</u> Blanton Decl., Exhibit A, Paragraph 24.

12. On or about November 5, 2013, Defendant Roundpoint assumed the servicing of Plaintiff Blanton's mortgage Loan from the Loan's previous servicer, Franklin. Plaintiff received notice of the change from Roundpoint by a letter dated November 15, 2013 captioned, "NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS." <u>See</u> Blanton Decl., Exhibit A, PLAINTIFF'S EXHIBIT 3.

13. Prior to sending out the Roundpoint notice of transfer, Roundpoint sent its first mortgage statement, dated November 11, 2013, to Plaintiff indicating that she was past due on her October 2013 mortgage payment. Roundpoint's statement claimed that Plaintiff owed two payments on her Loan (for October and November of 2013). <u>See</u> Blanton Decl., Exhibit A, PLAINTIFF'S EXHIBIT 4.

14. Defendant Roundpoint's very first statement to Blanton was incorrect and false

because, in fact, she made her October payment to Franklin American Mortgage Company back in early October of 2013, before receiving any notice from either servicer that the Loan's servicing rights were being transferred. <u>See</u> Blanton Decl., Exhibit A, Plaintiff's Exhibit 5.

15. Plaintiff timely made her November 2013 payment to Roundpoint for principal, interest, taxes and insurance (PITI) and her December invoice correctly reflected her payment for October's invoice. However, in a Roundpoint notice dated November 25, 2013, denominated "ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT" <u>See</u> Blanton Decl., Exhibit A, PLAINTIFF'S EXHIBIT 6.

16. Roundpoint informed the Plaintiff that due to Roundpoint's projected 2014 escrow calculations, her total monthly payment would increase from $1,029.01 to $1,166.53, an increase of $137.52 per month despite the fact that there were no changes in Plaintiff's real estate tax liability or insurance expense. <u>See</u> Blanton Decl., Exhibit A, Paragraph 28.

17. Defendant's calculations were, yet again, incorrect. A principal reason for the misstatement of the projected escrow was that Roundpoint inexplicably doubled Plaintiff's $81.86 monthly Private Mortgage Insurance (PMI) contribution which was a part of the Escrow. The PMI miscalculation alone would have cost Plaintiff an additional $982.32 per year. Further, in part because of the doubled PMI error, Roundpoint projected an escrow shortage for 2014 of $640.20. Therefore, the compounded error in Roundpoint's projection would have

improperly raised Plaintiff's monthly payment by another $53.35 per month. <u>See</u> Blanton Decl., Exhibit A, Paragraph 29.

18. Just between the two errors in the doubled PMI ($163.72 instead of 81.86) and putative escrow shortage ($53.35), Plaintiff's new monthly payment was set to increase $135.21 per month. In total, Roundpoint was going to overcharge Plaintiff Blanton based upon faulty escrow calculations by approximately $137.52 per month, or $1,650.24 in 2014 alone. <u>See</u> Blanton Decl., Exhibit A, Paragraph 30.

19. Plaintiff, upon receiving the initial 2014 escrow projection in November, contacted Roundpoint by telephone on numerous occasions to point out Roundpoint's mistakes and demand a correction to the 2014 escrow projection calculations. <u>See</u> Blanton Decl., Exhibit A, Paragraph 31.

20. Roundpoint's staff never conceded the obvious mistakes in its monthly statements and escrow analysis. Plaintiff was repeatedly treated in a condescending manner, and given incorrect or impossible explanations for the escrow mistakes from Roundpoint's staff. Plaintiff was told that her "PMI had increased" (not true, or even possible) or that the increases were due to the "need for a cushion." These statements were false, because the maximum cushion is ⅙ of the annual escrow, or two months of payments. Blanton continued to communicate on a regular basis with Roundpoint staff by telephone until approximately March of 2014. <u>See</u> Blanton Decl., Exhibit A, Paragraph 32.

21. Plaintiff made her regular November and December 2013 payments of $1,029.01 and continued to protest the incorrectly calculated, and substantially increased, monthly payment of

$1,166.53 that was set to take effect beginning in January of 2014. Plaintiff's continuing phone calls to Roundpoint were becoming increasingly frustrating and beginning to affect her blood pressure and physical health. See Blanton Decl., Exhibit A, Paragraph 33.

22. It was clear to Plaintiff that Roundpoint was not going to correct its errors in re-calculating the payments on her Loan. When her January 2014 Roundpoint statement included the incorrect and higher monthly payment, Plaintiff decided use a "self-help" approach to change the manner in which she paid her Loan. Because she had not been given any indication that Roundpoint would correct her total monthly payment, and the error was in the escrow analysis, she started sending in two checks every month to Roundpoint. See Blanton Decl., Exhibit A, Plaintiff's Exhibit 7.

23. The two checks paid the portion of the monthly payment that remained stable over the life of the loan: the combined principal and interest ($609.83) and the *correct* amount for PMI ($81.86). An example of Plaintiff's bifurcated payments is attached hereto as PLAINTIFF'S EXHIBIT 8. Plaintiff intended to see if Roundpoint would change her incorrect monthly payment. Moreover, Plaintiff was prepared to monitor and directly pay her real estate taxes and hazard insurance if Roundpoint continued to incompetently service her Loan. See Blanton Decl., Exhibit A, Paragraph 34.

24. Plaintiff timely paid Roundpoint her principal and interest and her PMI by two checks for January, February, March April, May, June, July, August, September, October, November and December of 2014. Plaintiff continued to telephone Roundpoint about its faulty escrow calculations, but to no apparent effect. See

Blanton Decl., Exhibit A, Paragraph 36.

25. In February of 2014 the first installment of the twice-yearly real estate tax collection for Cook County was about to come due. Knowing that the tax payments are usually sent to the County Treasurer by the servicer about a month in advance, in late January or early February of 2014 Plaintiff contacted Roundpoint to inquire whether Roundpoint was going to pay the first installment of the taxes out of her (incorrect) escrow balance and was informed by Roundpoint staff that the taxes had already been paid. See Blanton Decl., Exhibit A, Paragraph 37.

26. Plaintiff followed up with the Cook County Treasurer and was informed by a "Ms. Abdullah" that the taxes had not been paid. See Blanton Decl., Exhibit A, Paragraph 38.

27. Aware of Cook County's draconian procedures for collecting delinquent taxes, Plaintiff decided to pay the now-due installment of $1,433.58 directly to the Cook County Treasurer. Plaintiff paid the real estate taxes on February 4, 2014. See Blanton Decl., Exhibit A, Plaintiff's Exhibit 9.

28. Roundpoint sent an invoice dated February 4, 2014 for the March monthly payment, and as was true for January and February, the payment amount was inflated. Plaintiff sent in her two checks to Roundpoint for principal, interest and PMI. See Blanton Decl., Exhibit A, Paragraph 40.

29. Roundpoint sent a new "ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT" dated February 19, 2014. The re-worked escrow analysis correctly calculated the PMI amount at $81.86. The new escrow charges seemed correct, but there was no information about reconciling Plaintiff's account with the three prior

months' statements or withdrawing the late fees assessed against her. While the disclosure statement indicated the new reduced monthly payment was effective March 1, 2014, the earlier March statement was for the incorrect amount. Further, by March of 2014, Roundpoint had assessed $60.98 in late fees that were not taken off her account, notwithstanding the problems were caused by Roundpoint's own escrow analysis errors. See Blanton Decl., Exhibit A, Paragraph 41.

30. There were also monthly escrow balance changes reported on Blanton's statements from Roundpoint that couldn't be explained according to the Plaintiff's own records. Telephone contacts with Roundpoint continued to no avail. In late March of 2014 Roundpoint sent Plaintiff a Notice of Default. See Blanton Decl., Exhibit A, Paragraph 42.

31. On or about April 12, 2014 Plaintiff sent a "Letter of Dispute" to Roundpoint pointing out that all the obligations under the loan had been met and (the obligation to timely pay taxes and secure insurance were being directly handled by the Plaintiff) and that she disputed having the late payment fees attached to her account. See Blanton Decl., Exhibit A, Plaintiff's Exhibit 11.

32. On or about May 7, 2014 Roundpoint responded as usual, by adamantly (albeit vaguely) stating that Roundpoint's accounts were correct. Roundpoint attached copies of the Franklin loan transaction history (which was never in dispute) and the Roundpoint transaction history. Nowhere in the response did Roundpoint explain what particular transactions were causing a misunderstanding on Plaintiff's part. Further, the May 2014 response from Roundpoint continued to fail to acknowledge the February tax payment Plaintiff made directly to the Treasurer that was not

appearing as a credit on her monthly statements. <u>See</u> Blanton Decl., Exhibit A, Plaintiff's Exhibit 11.

33. In May of 2014, Plaintiff comparison-shopped for hazard insurance for her home and discovered that Liberty Mutual would provide the same coverages as the servicer-selected insurer, Safeco, but the Liberty Mutual policy would cost approximately $300 less per year. <u>See</u> Blanton Decl., Exhibit A, Paragraph 45.

34. Plaintiff informed Roundpoint that she would be purchasing the Liberty Mutual policy and Plaintiff paid for Liberty Mutual's policy to cover her home. <u>See</u> Blanton Decl., Exhibit A, Plaintiff's Exhibit 13.

35. On or about June 20, 2014 Plaintiff received a "NOTICE PURSUANT TO FAIR DEBT COLLECTION PRACTICES ACT" from Defendant Codilis and Associates, PC, asserting that she owed $99,913.01 on the now-accelerated Loan and threatening foreclosure if the balance was not paid in full. <u>See</u> Blanton Decl., Exhibit A, Plaintiff's Exhibit 14.

36. Despairing of any meaningful resolution with Roundpoint, Plaintiff decided to pursue a legal action against her servicer (and eventually Codilis) being known as *Melcina Blanton vs. Roundpoint Mortgage Servicing Corporation,* Case No. 2014-M1-136678 in Circuit Court of Cook County, First Municipal District. Plaintiff filed the action on July 7, 2014 and proceeded against Roundpoint *pro se.* <u>See</u> Blanton Decl., Exhibit A, Paragraph 48.

37. On or about June 10, 2014 Plaintiff received an unsolicited invitation to apply for a mortgage modification from Roundpoint. The letter included a blank application for a loss mitigation assistance. Plaintiff did not need or want a loan modification,

so she did not fill out or return the enclosed forms to Roundpoint. <u>See</u> Blanton Decl.,

Exhibit A, Plaintiff's Exhibit 15.

38. On or about July 10, 2014, Plaintiff received a follow-up and unsolicited offer from

Roundpoint for her to begin paying on a Trial Period Plan that, if properly

completed, would lead to a permanent loan modification. The letter falsely claimed

that "Your mortgage is seriously delinquent" and invited Plaintiff to "Please

Call ____at____if you have any questions about any of the above information." <u>See</u>

Blanton Decl., Exhibit A, Plaintiff's Exhibit 16.


39. The tone of the "offering documents" was that the Trial Plan was a formality she

needed to comply with in order to qualify for a permanent loan modification for an

extended, 40-year term and a reduced interest rate. Plaintiff was surprised to receive

the "loan modification" offer from Roundpoint because she did not apply for loss

mitigation assistance and, in fact, did not need or want a loan modification because

she had no trouble affording her mortgage. Plaintiff did not respond to the loan

modification offer (nor could she, as there was no specific person or number listed

in the offer), thereby declining to accept it. <u>See</u> Blanton Decl., Exhibit A, Paragraph

51.

40. On July 31, 2014, 2014 Roundpoint, by and through its attorneys, Defendant

Codilis, filed a complaint in foreclosure against the Plaintiff, being know as:

*Roundpoint Mortgage Servicing Corporation vs. Melcina Blanton, et al*., Case No.

14 CH 012508, Circuit Court of Cook County Illinois, County

Department-Chancery Division. (First Foreclosure) <u>See</u> Blanton Decl., Exhibit A,

Paragraph 52.

41. The Complaint filed in that action alleged that Plaintiff had "not paid the monthly installments of Principal, taxes, Interest and insurance for 02/01/2014 through to the present; the Principal balance due on the Note and Mortgage is $97,794.17, plus interest," and, etc. This allegation of Plaintiff's delinquency was patently untrue. See Blanton Decl., Exhibit A, Paragraph 53.

42. In fact, as was well known to Roundpoint and should have been well known to Defendant Codilis, the Plaintiff had paid all the principal, taxes, interest, and insurance on her Loan when this foreclosure was filed. As will appear more fully when evidence is adduced through discovery and at trial, Plaintiff Blanton had actually overpaid on her mortgage obligation through to the date the foreclosure action was filed and was not in arrears or default of her loan. See Blanton Decl., Exhibit A, Paragraph 54.

43. By the time the First Foreclosure action was filed, Plaintiff had actually paid a total of
$9,258.82 since January of 2014. If the Plaintiff had only made the "regular" (but still disputed) monthly payments over the same period of time (i.e. all of Roundpoint's invoices through July), the sum of the seven invoices would have only totaled $8,815.34. By August of 2014, Plaintiff had overpaid more than $400 on her Loan by choosing the self-help process of direct paying the taxes and hazard insurance on her property. See Blanton Decl., Exhibit A, Paragraph 55.

44. On or about August 15, 2014, while the First Foreclosure was still pending against her, Roundpoint sent a NOTICE OF DEFAULT AND INTENT TO

ACCELERATE, that contended, *inter alia*, that Plaintiff was not in arrears from February of 2014 (as alleged in the foreclosure filed against her just two weeks before) but only from May of 2014. This mid-suit Roundpoint notice contended that she owed $4,440.22 in total, with her regular mortgage payments making up $4,252.60 of that alleged delinquency. See Blanton Decl., Exhibit A, Plaintiff's Exhibit 17.

45. Defendant Roundpoint knew that these statements were patently false in mid-August of 2014 and could only be asserted against the Plaintiff by assiduously ignoring Plaintiff's self-help approach of assuming direct payment of the Loan-related taxes and insurance. In fact, by the

date of the notice, August 15, 2014, Plaintiff had advanced $3,725.30 to keep the taxes current and the insurance in place. See Blanton Decl., Exhibit A, Paragraph 57.

46. On or about August 27, 2014, Defendant Roundpoint by and through their attorneys, Defendant Codilis, filed a motion to dismiss the foreclosure suit against Plaintiff Blanton. Plaintiff did not join in dismissal of the suit and was in fact surprised when she received notice of the dismissal. See Blanton Decl., Exhibit A, Plaintiff's Exhibit 18.

47. Following dismissal of the First Foreclosure, Plaintiff and Roundpoint and Roundpoint's new counsel, Defendant Locke Lord, exchanged correspondence with no resolution, presumably because Plaintiff was not interested in a loan modification. It soon became clear to the Plaintiff that, notwithstanding the Roundpoint dismissal and the understanding that her Loan was "brought current" as

of the foreclosure dismissal date, Roundpoint and Locke Lord continued to treat the Loan as delinquent dating back from before August 27, 2014. <u>See</u> Blanton Decl., Exhibit A, Paragraph 59.

48. On or about October 20, 2014, Defendant Locke Lord, by attorney Courtney Nogar ("Nogar") sent a letter (PLAINTIFF'S EXHIBIT 19) to Plaintiff responding to her letter of September 9, 2014. (PLAINTIFF'S EXHIBIT 20) The letter from Nogar falsely claimed that Roundpoint was "not legally required to respond" to Plaintiff's notices of error or requests for information. The letter also claimed that Plaintiff could not directly contact Roundpoint for information until the litigation is resolved. This claim was false because the Real Estate Settlement Procedures Act (RESPA) and Regulation X (12 CFR Section 1024.35 and 1024.36) gives borrowers the right to notify servicers of errors or request information. <u>See</u> Blanton Decl., Exhibit A, Paragraph 60.

49. Locke Lord, via Nogar, also partially addressed the various prior misunderstandings and conflicts, including the series of events that led to Plaintiff paying her first half real estate taxes in February. Locke Lord also falsely claimed that Roundpoint paid the Cook County Treasurer the first half of the taxes related to Plaintiff's home on February 11, 2014, and because Plaintiff had already paid the taxes on February 4, 2014, the Treasurer returned the Roundpoint payment on April 22, 2014. <u>See</u> Blanton Decl., Exhibit A, Paragraph 61.

50. However the "screen shots" provided to "prove" this sequence of events were not actually from the Treasurer's office, as claimed by Locke Lord, but from CoreLogic,

a vendor of Roundpoint's, presumably hired to process tax payments in bulk.  See Blanton Decl., Exhibit A, Paragraph 62.

51. Plaintiff was so upset by the October 20, 2014 letter from Locke Lord that her blood pressure went sky-high. She called her doctor, who advised her to come in immediately. In an effort to get her dangerously high blood pressure under control, Plaintiff's doctor doubled Plaintiff's normal dose of blood pressure medication. See Blanton Decl., Exhibit A, Paragraph 63.

52. Thereafter, Plaintiff again checked with the Cook County Treasurer's office and was again told by "Mrs. Abdullah" from the Treasurer's office had never received a payment from Roundpoint for Plaintiff's home in February, and therefore had never returned a payment to Roundpoint. See Blanton Decl., Exhibit A, Paragraph 64.

53. Plaintiff continued to make monthly principal interest and PMI payments to Roundpoint.  However, Roundpoint stopped sending mortgage statements to Plaintiff for September and October of 2014. Plaintiff demanded that Roundpoint resume sending her statements by a letter dated October 31, 2014 (PLAINTIFF'S EXHIBIT 21) Roundpoint resumed sending monthly statements in November of 2014. See Blanton Decl., Exhibit A, Paragraph 65.

54. Roundpoint and Locke Lord continued to try to convince, cajole, and finally threaten, the Plaintiff to accept the proffered, but unwanted, loan modification. On or about November 18, 2014, Defendant Locke Lord sent an offer to settle the still pending suit Plaintiff filed against Roundpoint and Codilis back in July. (PLAINTIFF'S EXHIBIT 22) In exchange for dismissal of her suit and Plaintiff

signing various agreements and waivers, Plaintiff could secure the permanent phase of the trial loan modification offered back on July 10, 2014. <u>See</u> Blanton Decl., Exhibit A, Paragraph 66.

55. Plaintiff had not applied for a loan modification, had not accepted the trial modification, had not signed it, had not returned it to Roundpoint, and had not paid any of the three $772.12 monthly payments required to be offered the permanent modification. However, Locke Lord's cover letter to Plaintiff offering the permanent modification said in relevant part: "As you know, you remain in arrears on your loan but because of payments made on the trial modification offered by Roundpoint on July 10, 2014, Roundpoint dismissed the foreclosure case against you." The letter continued, "Because of your timely payments on that trial modification, Roundpoint now offers you a permanent modification, enclosed for your review." <u>See</u> Blanton Decl., Exhibit A, Paragraph 67.

56. These assertion by Defendant Locke Lord of the Plaintiff being in arrears was untrue. Locke Lord's assertions that Plaintiff had made "timely payments" on the trial modification is a complete falsehood. Moreover, the assertion that the dismissal of the First Foreclosure was in consideration for her acceptance and completion of the trial modification from Roundpoint, is also completely false. As stated above in Paragraph 54, Plaintiff Blanton had nothing to do with the dismissal of the First Foreclosure. She was surprised to learn of the dismissal on August 27, 2014, and had not agreed to any settlement to secure the dismissal. Plaintiff had assumed that Roundpoint and their counsel saw that the suit was baseless, because she was current on her loan, Roundpoint's repeated claims to the contrary notwithstanding. <u>See</u>

Blanton Decl., Exhibit A, Paragraph 68.

57. Plaintiff again declined the loan modification offer and did not respond or return the documents required to begin the modification. <u>See</u> Blanton Decl., Exhibit A, Paragraph 69.

58. Plaintiff continued to make her payments on the Loan's principal and interest and the PMI. However, those payments were not being applied in any understandable manner to the principal and interest obligations on her loan. <u>See</u> Blanton Decl., Exhibit A, Paragraph 70.

59. Beginning in January of 2015, Roundpoint started returning all of the Plaintiff's checks unnegotiated. (PLAINTIFF'S EXHIBIT 23) Each and every payment sent in 2015 has been returned with the exception of April 2015, which payments were accepted for reasons unknown to the Plaintiff. The net effect of this refusal to accept payments has been to cause the "delinquency" on Plaintiff's Loan to skyrocket in 2015. <u>See</u> Blanton Decl., Exhibit A, Paragraph 71.

60. As of August of 2015, Roundpoint is reporting the Plaintiff as delinquent in the total amount of $22,587.52. <u>See</u> Blanton Decl., Exhibit A, Paragraph 72.

61. In addition to the proffered but returned principal, interest and PMI payments throughout 2015 (excepting April) Plaintiff has directly paid the Cook County real estate taxes and renewed the Liberty Mutual hazard insurance for 2015-2016. <u>See</u> Blanton Decl., Exhibit A, Paragraph 73.

62. On or about March 30, 2015, Plaintiff, who was at this point frustrated beyond belief, wrote a letter to the President of Roundpoint, David Worrall. Her letter, entitled "Letter Disputing all Charges to present, Default and Acceleration,"

explained that she has proof that she has made her payments. (PLAINTIFF'S EXHIBIT 24) Roundpoint later acknowledged that the letter was received on April 6, 2015. <u>See</u> Blanton Decl., Exhibit A, Paragraph 74.

63. On or about April of 2015, Roundpoint retained Defendant Johnson, Blumberg & Associates, LLC in the continuing effort to "collect" on the Plaintiff's Loan. On June 2, 2015, Johnson Blumberg responded to a telephone inquiry from the Plaintiff on May 8, 2015, asking Johnson Blumberg to validate the debt they were attempting to collect on behalf of Roundpoint. (PLAINTIFF'S EXHIBIT 25) To validate the debt Johnson Blumberg included a copy of the Note, Mortgage and Loan History, but without any effort to explain the loan history documentation. <u>See</u> Blanton Decl., Exhibit A, Paragraph 75.

64. Of the 22 unnumbered pages comprising the enclosed Roundpoint "Loan History" only six pages include a column of dates to reference numerous often cryptic transactions. The other pages are comprised of "free floating" columns of numbers without a guide or a key to understanding what they mean. In short, these reports, which could and should have been formatted to fit onto 4 to 6 pages, are rendered mostly useless for a concerned debtor to decipher the alleged basis for the alleged debt. <u>See</u> Blanton Decl., Exhibit A, Paragraph 76.

65. Meanwhile, Plaintiff continued to receive false and conflicting information from Roundpoint. For example, a statement from Roundpoint dated May 18, 2015 claims that the "Amount Due" is $16,809.33 and "As of 5/18/2015, you are 351 days delinquent on your mortgage loan." <u>See</u> Blanton Decl., Exhibit A, Plaintiff's Exhibit 26.

66. Four days later, Jeffrey P. Martin, an assistant vice president of Roundpoint, finally responded to Plaintiff's March 30, 2015 letter to Roundpoint's president, David Worrall. The May 22, 2015 letter states that Plaintiff's letter was received on April 6, 2015. It appears to be a response to a Request for Information (RFI) and Notice of Error (NOE) under the Real Estate Settlement Procedures Act and answers "questions" that were never asked by Plaintiff. See Blanton Decl., Exhibit A, Paragraph 78.

67. The May 22, 2015 letter states: "The net amount due to bring the account current is $11,245.36." (PLAINTIFF'S EXHIBIT 27). The letter does not actually address any of Plaintiff's concerns. See Blanton Decl., Exhibit A, Paragraph 79.

68. Extremely confused by the $5,000-plus difference between the May 18 statement and the May 22 letter, Plaintiff sent another NOE to Roundpoint on or about June 9, 2015. See Blanton Decl., Exhibit A, Plaintiff's exhibit 28.

69. In her letter, Plaintiff requested, once again, that Roundpoint correct its numerous errors and misstatements regarding her account. Plaintiff also requested that Roundpoint remove all incorrect charges and provide a complete, decipherable payment history. See Blanton Decl., Exhibit A, Paragraph 81.

70. On or about July 7, 2015 Johnson Blumberg, counsel on behalf of Roundpoint filed another foreclosure action against the Plaintiff being known as: *Roundpoint Mortgage Servicing Corporation v. Melcina Blanton, et. al.*, 15 CH 10526, Circuit Court of Cook County Illinois, County Department-Chancery Division**.** (Second Foreclosure) In the Complaint Defendants Roundpoint and Johnson Blumberg

allege the same basic facts as alleged in the First Foreclosure but do not plead the now highly elevated arrearage. <u>See</u> Blanton Decl., Exhibit A, Paragraph 82.

71. Plaintiff has been forced to retain counsel to defend the Second Foreclosure. <u>See</u> Blanton Decl., Exhibit A, Paragraph 83.

72. To date, Roundpoint continues to insist that there has been "no error by Roundpoint." In a letter dated August 4, 2015, Roundpoint claimed that it had found "no evidence to support [Plaintiff's] allegations." (PLAINTIFF'S EXHIBIT 29) However, the enclosed documents tell a different story. For example, a document entitled "Blanton Escrow Disbursement Amounts" clearly demonstrates that Plaintiff was overcharged on her PMI. Another enclosure entitled "Blanton Corporate Advanced Amounts" shows a charge for a property inspection on August 28, 2014 -- *after* the First Foreclosure was dismissed. The Document entitled "Payment History" (PLAINTIFF'S EXHIBIT 30) was sent to Plaintiff in response to the Notice of Error dated June 9, 2015 (PLAINTIFF'S EXHIBIT 28). <u>See</u> Blanton Decl., Exhibit A, Paragraph 84.

**RUBENSTEIN BUSINESS LAW**
Attorneys for Plaintiff
David Rubenstein


By: *s/David Rubenstein*
    David Rubenstein, Esq.
    RUBENSTEIN BUSINESS LAW
    30 S. Wacker Drive, 22nd Floor

Chicago, IL 60606
Phone: 312-466-5612
Fax: 312-466-5601

Dated:  September 7, 2018